815 F.2d 457
 55 USLW 2582
 UNITED STATES of America ex rel. John SHIFLET, Petitioner-Appellee,
v.
Michael LANE, Director, Illinois Department of Corrections,
and James Thieret, Warden, Menard Illinois
Correctional Center, Respondents-Appellants.
 No. 86-1138.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 3, 1986.
Decided March 25, 1987.
 
 Josette M. Skelnik, Robinson & Skelnik, Elgin, Ill., for petitioner-appellee.
 Terence M. Madsen, Ill. Atty. Gen. Office, Chicago, Ill., for respondent-appellants.
 Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Appellee John Shiflet was convicted of the murder of his wife after a trial by jury in an Illinois state court. Mr. Shiflet was sentenced to a term of life imprisonment. The appellate court affirmed his conviction, People v. Shiflet, 125 Ill.App.3d 161, 80 Ill.Dec. 596, 465 N.E.2d 942 (1984), and the Illinois Supreme Court denied leave to appeal. Having exhausted the available state remedies, Mr. Shiflet petitioned the district court pursuant to 28 U.S.C. Sec. 2254 for a writ of habeas corpus. Mr. Shiflet claimed that the government's use of information obtained in violation of the attorney-client privilege violated his sixth and fourteenth amendment rights to the effective assistance of counsel and to a fair trial. The district court granted the petition for habeas corpus. We reverse.
 
 
 2
 The factual background of this case is set forth in detail in the opinion of the Appellate Court of Illinois, People v. Shiflet, 125 Ill.App.3d 161, 80 Ill.Dec. 596, 465 N.E.2d 942 (1984), and in the opinion of the district court, United States ex rel. Shiflet v. Lane, 625 F.Supp. 677 (N.D.Ill.1985). We shall therefore include only those facts necessary to the disposition of the issues before us.
 
 I.
 
 3
 A. The Investigation and State Court Proceedings
 
 1. The Discovery of the Crime
 
 4
 Mr. Shiflet reported that his wife was missing on the night of September 30, 1980. Early the next morning, her body was discovered along a road about three miles from the apartment she shared with her husband. She was wearing a shirt and blue jeans and was barefoot. A police investigator noted that her hands and feet were very clean and that there were blood stains on the shirt and a black tar-like substance on the jeans. The investigator went to the apartment complex where the Shiflets had lived. He found a blood-spotted leaf next to the victim's automobile, blood spots on the rear portion of the car and also on the steps leading to the Shiflet apartment.
 
 2. The Initial Interview with the Defendant
 
 5
 Later that morning, police officers interviewed the defendant with respect to the prior evening's events. He told the police that the victim was upset when she had returned from work at 4:45 p.m. Later, at about 8:00 p.m., while the couple was watching a television movie, the victim became emotional and, according to Mr. Shiflet, threw a glass of ice tea on the floor and left the apartment saying, "I've got to get out of here."
 
 
 6
 The defendant stated that, when his wife did not return, he drove around looking for her. He then called her sister and brought her to the apartment. The victim's mother later joined them. Mr. Shiflet also told the officers that he called the police at 11:30 p.m. and again at 5:00 a.m. At that time, an officer was dispatched to take a missing person report.
 
 
 7
 At about noon, the defendant attempted to remove his wife's car from its parking place. When an officer stopped him, he stated that he was removing the car on the advice of counsel.
 
 3. The Autopsy
 
 8
 An autopsy of the victim's body disclosed a large wound on the top of the head that penetrated the skull. However, little blood was found on the victim's hair and skull. The examining physician therefore concluded that the victim's head had been washed. The examination also revealed small scratches on the neck and hemorrhages on the neck and face. The doctor was unable to take fingernail scrapings from the victim; her nails had been cut too short. He did, however, remove a tar-like substance from her body. He concluded that Mrs. Shiflet had died from loss of blood. There was also evidence of strangulation but it could not be determined whether it contributed to her death.
 
 4. The Initial Search--Warrant # 3218
 
 9
 On October 1, the state court issued a warrant for the search of the Shiflet apartment. The search was conducted at 5:45 p.m. A pair of blue jeans and a shirt were seized. The pants were damp and laboratory tests confirmed the presence of blood.
 
 
 10
 Earlier that day, the police conducted a search of a vacant apartment below the Shiflet's apartment. Traces of blood were found on the bathroom fixtures and blood and hair were found in the closet.
 
 
 11
 5. Mr. Shiflet Consults an Attorney--the Subsequent Unethical Disclosure
 
 
 12
 On October 1, at about 1:00 p.m., Mr. Shiflet consulted an attorney, Charles Kaeding, who agreed to represent him during the investigation of his wife's murder. Mr. Kaeding instructed Mr. Shiflet to provide John Ylisela, a private investigator, with the details concerning his wife's death. Mr. Ylisela often worked for Mr. Kaeding and shared office space with him. During an interview with Mr. Ylisela, Mr. Shiflet divulged information about how he had killed his wife and disposed of her body.
 
 
 13
 On the evening of October 1, Mr. Ylisela contacted Paul Dungan, a deputy sheriff for DuPage County, at the sheriff's office and informed Detective Dungan that he possessed important information regarding Mrs. Shiflet's death. Mr. Ylisela and Detective Dungan had served as fellow police officers and had known each other for six to eight years. At a secret meeting in a parking lot, Mr. Ylisela told Detective Dungan that Mr. Shiflet had killed his wife. Mr. Ylisela then related his understanding of how Mr. Shiflet had killed his wife and disposed of her body. Mr. Ylisela related that while watching a loud movie on television, the defendant struck his wife on the head with a hammer that had a new handle; she fell to the floor, but had not died, so he choked her. She scratched him repeatedly on his arms and upper body. The defendant placed a plastic bag over her head and clipped her fingernails. He then cleaned up the carpet with soap and water, drying it with a hair dryer. He placed the body in the trunk of her car, then called the police to advise them that his wife was missing. Thereafter, the defendant drove into the country and deposited the body near the road. When the defendant returned to the apartment, he called his wife's family and brought his sister-in-law back to the apartment. While she was there, he noticed blood on his pants and cleaned them in the sink.
 
 
 14
 Detective Dungan inquired as to the source of Mr. Ylisela's information and was told "You don't want to know." 625 F.Supp. at 680. Mr. Ylisela also said he would deny having met with Detective Dungan or telling him anything.
 
 
 15
 After receiving this information, Detective Dungan falsely informed Sergeant George Weihofen that an unknown informant had provided him with the details of the murder. In the police report he prepared, Detective Dungan falsely indicated that he had spoken to an unknown male who would not reveal his identity and whom Detective Dungan had never before seen. Detective Dungan's superiors later ordered him to file a second report disclosing the identity of the informant. The record does not make clear how his superiors discovered the falsity of the first report. However, Sergeant Weihofen had been advised that Mr. Kaeding was Mr. Shiflet's attorney and he later learned that Mr. Ylisela shared office space with Mr. Kaeding. Detective Dungan then rewrote the report naming Mr. Ylisela as the source, describing him as a citizen who was not a paid informant.
 
 
 16
 On October 2, Mr. Ylisela was summoned to the sheriff's office. When questioned about the possibility that he provided police officers with information about the murder, Mr. Ylisela denied having given the officers any information, but admitted that he knew some of the officers. On the morning of October 3, Al Botti, a local attorney apparently affiliated with Mr. Kaeding, told an assistant state's attorney, Thomas Knight, that questioning Mr. Ylisela on any matter pertaining to Mrs. Shiflet's death would constitute a breach of the attorney-client privilege.
 
 
 17
 6. Search of the Victim's Car--Warrant #3215
 
 
 18
 On the morning of October 2, police officers searched Mrs. Shiflet's car pursuant to a second search warrant. The officers seized a hatchet handle and tarp, both of which tested positive for the presence of blood. Tests also indicated traces of blood on both the trunk's carpeting and the plastic molding on the trunk's interior.
 
 
 19
 7. The Second Search of the Shiflet Apartment--Warrant # 3219
 
 
 20
 On October 3, Detective Dungan applied for a third search warrant. The warrant authorized the seizure of "blood stains, fingernail clippings, hammer with a new handle." All of these items were seized during the search and admitted into evidence at the trial. The affidavit submitted in support of the application for a warrant was described by the Appellate Court of Illinois as follows:
 
 
 21
 The complaint and affidavit initially stated that Detective Dugan [sic] had been contacted by and met with John Ylisela on October 1, 1980. It then repeated the detailed information given to Dugan [sic] by Ylisela relating to the killing of defendant's wife as earlier noted, identifying Ylisela as an ordinary citizen who is not a paid police informant.
 
 
 22
 The next paragraphs of the complaint stated "that independently of this above-mentioned conversation with John Ylisela, your affiant, being assigned the investigation of this homicide is informed as follows:". There followed a recitation of purported facts known to the affiant through his personal observation and the investigative efforts of other officers, in which the affidavit stated, inter alia:
 
 
 23
 That decedent's body was discovered at 7:50 a.m. by a jogger and reported to the sheriff's office, that affiant went to the scene and viewed it; that John Shiflet identified the deceased as his wife; that on September 30, 1980, between 7 p.m. and 10 p.m., a television program dealing with the execution of Jews in Nazi Germany was aired, affiant gaining this information from WBBM TV, Channel 2 in Chicago; that decedent's head bore a wound consistent with being struck with a hammer, as observed by affiant and by discussion with the physician who performed the autopsy; that a hammer with a new handle was observed in the decedent's apartment by other officers who so advised affiant; that wounds on decedent's throat were consistent with strangulation; that Joan Alleva reported to officers that John Shiflet had scratches on his arms on the night of October 1, 1980; that no blood or wet spots were seen on the carpet by officers executing a search warrant on October 1, 1980; that decedent's fingernails were cut short and fingers cleaned, as observed by the autopsy physician, and decedent's mother noted the nails were extremely short and poorly clipped although they had been long and well groomed; that blood was observed by affiant on the staircase of decedent's apartment on October 1, and also on rocks near the building and decedent's car; that her car had blood in the trunk; that John Shiflet reported to the sheriff's office his wife had been missing since 8 p.m. on October 1; that decedent's purse was found by a truck driver, who reported it to affiant, and her shoe was found by the side of the road; that no plastic bag containing blood has been recovered; that on execution of a prior search warrant No. 3218 on October 1, damp blue jeans containing blood were located in John Shiflet's closet; that decedent's mother observed defendant's knuckles were cut and bruised on October 2.
 
 
 24
 The complaint and affidavit concluded by reciting that on the morning of October 3, 1980, affiant was told by assistant State's Attorney Thomas Knight that he had just received a telephone call from Attorney Al Botti who told him no one should question John Ylisela about anything he may have learned from Botti's client, Shiflet, as it was protected by the attorney-client privilege because Ylisela was working for Shiflet's attorney.
 
 
 25
 Shiflet, 80 Ill.Dec. at 602-03, 465 N.E.2d at 948-49.
 
 
 26
 8. The Motion to Suppress the Evidence Seized During the October 3 Search
 
 
 27
 The state trial court denied Mr. Shiflet's motion to suppress the evidence obtained in the October 3 search. The trial court found that there had been no invasion of the attorney-client privilege because the information obtained by the police from Mr. Ylisela had not been affirmatively sought by the police. The trial court further found that there was ample evidence to support the issuance of a warrant. However, the court did not indicate whether its determination in that regard was dependent upon the information provided by Mr. Ylisela.
 
 
 28
 On appeal, the Appellate Court of Illinois affirmed the determination of the trial judge. It noted that there had been no affirmative act on the part of the state to breach the attorney-client relationship. "Nor were the police aware, when they received the information, that its source was a privileged communication." Shiflet, 80 Ill.Dec. at 603, 465 N.E.2d at 949. It further found that "the complaint and affidavit for search warrant, absent the facts supplied by Ylisela, was sufficient to establish probable cause for the second search of the defendant's apartment." Id. at 604, 465 N.E.2d at 950.
 
 
 29
 While it is true this search focused upon the hammer with a new handle and blood stains on the carpet not earlier noticed, sufficient facts were known to the officers, without Ylisela's assistance, to induce them to return to the apartment seeking further evidence of the crime. As the untainted facts in the complaint and affidavit amply support issuance of the search warrant, we conclude the evidence seized was not subject to suppression on the grounds urged by defendant.
 
 
 30
 Id.
 
 B. The Holding of the District Court
 
 31
 The district court first addressed whether the holding of the Supreme Court in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) bars adjudication of this habeas petition. Under Stone, a person convicted in state court may not challenge the conviction in a federal habeas proceeding on the ground of an unconstitutional search and seizure in violation of the fourth amendment as long as the state has provided a full and fair opportunity to litigate that claim. Id. at 494, 96 S.Ct. at 3052. In this case, the state submitted that Mr. Shiflet's habeas petition was essentially a fourth amendment claim expressed in sixth amendment terms. However, the district court held that, even though the petitioner sought the exclusion of evidence seized pursuant to a search warrant, petitioner's claim was grounded in the sixth amendment, not the fourth amendment. Thus, the district court rejected the state's contention that it could not adjudicate the habeas petition under the mandate of Stone, 625 F.Supp. at 682.
 
 
 32
 The district court then examined whether, after excluding the privileged information divulged by Mr. Ylisela, there was sufficient independent information to support a finding of probable cause with respect to the October 3 search warrant of Mr. Shiflet's apartment. The district court disagreed with the finding of the Illinois appellate court that probable cause existed even if the privileged information were excluded from the warrant. The district court conducted a de novo review of this issue because in its view, the probable cause finding constituted a legal, rather than a factual, determination:
 
 
 33
 Since probable cause is a legal, not a factual, determination we are permitted to address this question in the context of a Sixth Amendment claim even though the state court made a specific finding on the issue. We disagree with the state appellate court's determination that probable cause would have been established had Ylisela's information not appeared in the warrant.
 
 
 34
 Id. at 683.
 
 
 35
 After addressing the preceding issues, the district court considered whether the admission of the evidence seized during the second search of the apartment violated Mr. Shiflet's sixth and fourteenth amendment rights to the effective assistance of counsel and to a fair trial. Acknowledging that there was no authority directly on point, the district court, in what it termed "a mere extrapolation of principles outlined by other federal courts in assessing violations of the Sixth Amendment arising from the breach of the attorney-client privilege," id. at 689, held that an intentional intrusion by the state into the attorney-client relationship is not crucial to finding a violation of the defendant's rights. "Where government use of privileged information obtained by windfall causes extreme prejudice to the defendant and renders his right to counsel virtually meaningless, a constitutional problem arises. What happened to Shiflet should not be permitted to happen to any criminal defendant." Id. at 686. Relying on the Supreme Court's holding in Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the district court held that "the two most important elements for the purpose of defining Sixth Amendment rights seem to be the level of government intrusion and the extent to which a defendant has been exposed to prejudice resulting from the disclosure of privileged information." 625 F.Supp. at 686-87. Applying those standards, the district court concluded that, although the law enforcement officials did not deliberately seek information protected by the attorney-client privilege, the officers, once they knew the information was privileged, continued to use the information to obtain the October 3 search warrant. The district court further determined that the level of prejudice to Mr. Shiflet resulting from the state's use of the privileged information was "extreme." Id. at 689. The district court thus concluded that the state's knowing use of the privileged information to obtain the third warrant combined with the extremely prejudicial nature of the disclosure constituted a sixth amendment violation.
 
 III
 
 36
 A. Federal Review of the Probable Cause Determination
 
 
 37
 The Appellate Court of Illinois squarely held that there was sufficient evidence, other than that supplied by Mr. Ylisela, to support a finding of probable cause for the October 3 search warrant. Nevertheless, in this collateral review of Mr. Shiflet's conviction, the district court believed that it was free to redetermine that issue. We respectfully disagree. There is no question that the validity of the search was fully and fairly litigated in the Illinois courts. Under these circumstances, we believe that the Supreme Court's mandate in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) precludes any further inquiry into the matter by the federal courts on collateral review. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." Id. at 482, 96 S.Ct. at 3046.
 
 
 38
 Our obligation to follow the mandate of Stone is not altered by Mr. Shiflet's claim that his objection to the search is grounded in a sixth amendment right to counsel claim instead of a fourth amendment claim. The Illinois appellate court squarely held that the search was valid even if all of the information that had been obtained from Mr. Ylisela were excluded from consideration. We must, under the holding of Stone, respect that determination.
 
 
 39
 We realize that, in Kimmelman v. Morrison, --- U.S. ----, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986), the Supreme Court held that the restriction on federal habeas review announced in Stone v. Powell was not applicable to sixth amendment ineffective assistance of counsel claims that are founded primarily on incompetent representation with respect to a fourth amendment issue. See also Goins v. Lane, 787 F.2d 248, 252 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 165, 93 L.Ed.2d 103 (1986). The situation before us, however, is substantially different. First, counsel for Mr. Shiflet explicitly states that his claim is not predicated upon the ineffective assistance of counsel analysis of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellee's Br. at 16. Second, there is no claim that, at trial, defense counsel representing Mr. Shiflet (not the same attorney who employed Mr. Ylisela) did not raise and litigate fully the admission of evidence obtained during the October 3 search. Mr. Shiflet was not deprived of his day in state court with respect to the validity of the October 3 search. Because the issue decided by the Illinois courts solely addressed a fourth amendment concern--whether probable cause existed to support the warrant--and because the state provided an opportunity for full and fair litigation of this issue, we find that federal review of this determination is precluded.
 
 B. Sixth Amendment Concerns
 
 40
 Our determination that the district court erred in reconsidering the validity of the October 3 search does not entirely end our inquiry. Mr. Shiflet also contends that, regardless of the validity of that search, his sixth amendment rights were nevertheless violated by the disloyalty of his first counsel's investigator. Mr. Ylisela's disclosure of the details of the murder, it is argued, facilitated the execution of the October 3 warrant and may even have been solely responsible for the retrieval of certain items of evidence that would otherwise have gone unnoticed.[1]
 
 
 41
 However, even if we assume that Mr. Ylisela's disclosure of the details of the murder facilitated the execution of the warrant, Mr. Shiflet's argument that the admission of the evidence seized during the search violated his right to counsel fails because the protections of the sixth amendment had not attached when Mr. Ylisela divulged Mr. Shiflet's disclosures to Detective Dungan.[2] Just last Term, in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court squarely reaffirmed that, "[b]y its very terms, [the sixth amendment] becomes applicable only when the government's role shifts from investigation to accusation." Id., 106 S.Ct. at 1146.This is because, after the initiation of adversary criminal proceedings, "the government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified. It is then that the defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law."
 
 
 42
 Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1986) (quoting United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984)). Indeed, this court has already stated that the "right to counsel attaches only when a defendant proves that, at the time of the procedure in question, the government had crossed the constitutionally-significant divide from fact-finder to adversary." United States ex rel. Hall v. Lane, 804 F.2d 79, 82 (7th Cir.1986); see United States ex rel. Espinoza v. Fairman, 813 F.2d 117, 120-22 (7th Cir.1987); see also DeAngelo v. Wainwright, 781 F.2d 1516, 1519-20 (11th Cir.1986).
 
 
 43
 Here, Mr. Shiflet apparently decided that the circumstances surrounding the discovery of his wife's murder made it prudent for him to consult counsel several hours after the body was discovered and while the police were still investigating the matter. Mr. Shiflet, however, cannot claim the protection of the sixth amendment merely because he retained counsel prior to the filing of charges against him. In Moran, the Supreme Court explicitly noted that "it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation." 106 S.Ct. at 1146. Indeed, the Court expressly addressed the situation that confronts us here:
 
 
 44
 [T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the " 'prosecutorial forces of organized society.' " Maine v. Moulton, 474 U.S., at ----, 106 S.Ct., at 484 (quoting Kirby v. Illinois, 406 U.S., at 689, 92 S.Ct., at 1882).
 
 
 45
 Moran, 106 S.Ct. at 1146. We hold, therefore, that Mr. Shiflet cannot, under these circumstances, successfully contend that his sixth amendment rights were violated.[3]
 
 IV
 
 46
 Mr. Shiflet also contends that the admission of the evidence seized during the second search of the apartment was so offensive as to deprive him of the fundamental fairness guaranteed by the fourteenth amendment's due process clause. He submits that the police and prosecutorial conduct in this case violated canons fundamental to the " 'traditions and conscience of our people.' " Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)). Although on facts more egregious than those presented here police misconduct could rise to a level of a due process violation, see Moran, 106 S.Ct. at 1147, we do not find that the challenged conduct "so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the states." Id. at 1148.
 
 
 47
 Indeed, other than Detective Dungan's decision to secure the third warrant using information disclosed by Mr. Ylisela after the state's attorney had warned him that the information was confidential, the government demonstrated no intent to exploit the breach of the attorney-client relationship. Detective Dungan's supervisors instructed him to correct his report once they suspected that his initial report was inaccurate, and the sheriff's office questioned Mr. Ylisela about providing police officers with information about Mrs. Shiflet's death. Further, the complaint and affidavit submitted to the magistrate to procure the warrant recited that Detective Dungan was told by the assistant state's attorney that Mr. Ylisela was working for Mr. Shiflet's attorney and that information obtained from Mr. Ylisela was protected by the attorney-client privilege. These actions demonstrate the government's efforts to avoid using privileged information in an underhanded way and distinguish this case from situations in which law enforcement agents deliberately invade the attorney-client relationship.
 
 
 48
 Because Mr. Shiflet was not deprived of his right to counsel or of his right to a fair trial under the due process clause, the judgment of the district court is reversed.
 
 
 49
 REVERSED.
 
 
 
 [1]
 Although it is difficult to predict with certainty what evidence the police would have seized without having received the privileged information, it appears that the officers would not have known to seize the hair dryer that was used to blow dry the carpeting or the hammer with the new handle that was the murder weapon. As the appellants contend in their brief, the officers would have, in all likelihood, eventually discovered the hammer once the laboratory tests revealed that the hatchet handle seized from the car had not been used as the murder weapon. Appellants' Br. at 29. However, it is questionable whether they would have seized the hammer from the apartment during the second search without having been told how Mr. Shiflet committed the crime. Also, the district court believed that the officers would not have known to seize the blood-stained carpeting and carpet padding absent Mr. Ylisela's disclosures because the police had not observed blood stains during the first apartment search. 625 F.Supp. at 684. However, in view of the evidence already uncovered by the police, such as the blood-stained pants seized from the closet, the police would have had reason to suspect that portions of the carpeting were blood-stained. Further, it is not unreasonable to assume that the police would have seized the vacuum-cleaner bag containing the fingernail clippings without the benefit of Mr. Ylisela's disclosures. Considering that two witnesses observed that the victim's nails had been trimmed closely when she ordinarily wore them long and that Mr. Shiflet's arms were scratched, the police would have had reason to believe that the victim's nails had been cut and the apartment was the logical place to search for the clippings
 
 
 [2]
 Appellee argues in his brief that the state has waived the argument that the sixth amendment had not attached because it failed to raise the issue before the district court. Appellee's Br. at 14-15. In general, litigants must present their arguments before the district court or else they are waived. However, "[t]here are 'narrow exceptions' to the rule that a ground for reversal cannot be presented for the first time on appeal, 'where jurisdictional questions are presented or where, in exceptional cases, justice demands more flexibility.' " Libertyville Datsun Sales v. Nissan Motor Corp., 776 F.2d 735, 737 (7th Cir.1985) (quoting International Travelers Cheque Co. v. BankAmerican Corp., 660 F.2d 215, 225 (7th Cir.1981)). Here, the decision of the district court was issued twenty-one days after the decision of the Supreme Court in Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1986). The district court's failure to deal with that decision in its holding suggests that, due to the pressure of business, the court had not had an opportunity to evaluate its significance in this case. Moreover, the Supreme Court's decision in Moulton was reinforced in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) which was decided approximately three months after the decision of the district court. Under these circumstances, we believe that, as an intermediate appellate court, we are under an independent duty to follow the pronouncements of the Supreme Court. That Court, not this bench, has the final responsibility for defining the nature and content of the sixth amendment. See generally United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 148, 2 L.Ed. 60 (1803)
 
 
 [3]
 In light of our holding that the protections of the sixth amendment had not attached when Mr. Ylisela improperly divulged information to Detective Dungan, we need not address whether a violation of that amendment could be premised on a situation such as the present one where there was no deliberate governmental intrusion or deception. See generally Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Nor need we decide, assuming that such conduct could violate the amendment, whether Mr. Shiflet was significantly prejudiced. We do note that the Illinois Appellate Court found that "most of the information given by [Mr. Ylisela] was already known to the police...." Shiflet, 80 Ill.Dec. at 604, 465 N.E.2d at 950. In our role as a federal court reviewing a habeas petition, we would have to give deference to that finding. Sumner v. Mata, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981)