**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Aaron M. BINDER and Frederick G. Celani, Defendants-Appellants.**

Nos. 85–2561, 85–2562.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1986.

Decided June 30, 1986.

Rehearing and Rehearing En Banc Denied Aug. 4, 1986.

Michael Kopec, Esq., Jon Gray Noll, Springfield, Ill., for defendants-appellants.

Richard N. Cox, U.S. Atty., Gerald D. Fines, U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge and MAROVITZ, Senior District Judge *.

BAUER, Circuit Judge.

Defendants Frederick G. Celani and Aaron M. Binder appeal from their convictions for racketeering, conspiracy to commit racketeering, wire fraud, mail fraud, and the interstate transportation of property obtained by fraud. Celani was sentenced

---

* The Honorable Abraham Lincoln Marovitz, Senior District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation.

to 15 years imprisonment to be followed by 5 years probation, and Binder was sentenced to ten years imprisonment to be followed by 5 years probation. Additionally, both were ordered to pay restitution, either jointly or separately, in the amount of $404,000. On appeal, the defendants argue that the government illegally seized documents from their business offices and that they were improperly denied certain services, including appointed counsel for Celani, necessary to ensure that they received a fair trial. We affirm the defendants' convictions.

## I.

The defendants' convictions resulted from a fraudulent tax shelter scheme and a fraudulent business scheme. The tax shelter scheme centered on the activities of Celani, Celani & Associates (CCA), which the defendants incorporated in 1981 and for which they served as principal stockholders and major officers. CCA was first located in Encino and later in Sherman Oaks, California. The defendants represented CCA to the public as a high technology engineering firm specializing in the creation of research and development limited partnerships. Celani claimed to be a mechanical engineer with 14 years experience and to possess advanced degrees from several well known universities, including a Ph.D. from the "University of England, Oxford" [sic]. CCA's sole source of income during its brief existence came from investors who bought its limited partnerships as tax shelters. In 1981 and 1982 these sales amounted to approximately $3.8 million. During those two years, the defendants filed tax returns for 26 limited partnerships in which they claimed that they had spent over $14 million in the research and development of the projects.

In actuality, Celani was not a mechanical engineer and possessed none of the college degrees he purported to have earned. Further, the research and development expenses CCA claimed were for nothing more than concocting sham models of supposedly high technology products to dupe investors.

For example, CCA's research and development of "Porta Laser," a hand-held laser gun, consisted of purchasing a non-working laser for $750, cleaning it, and mounting it for display. The defendants reported to the IRS that the research and development of "Porta Laser" cost $2.7 million. A similar effort was expended in the development of "Satellite Systems, Ltd.," for which the defendants obtained two non-working parabolic dishes from a junkyard, painted them, and mounted them for display. The defendants reported to the IRS that they spent only $700,000 to develop this technological marvel. The printed circulars mailed to investors to generate interest in these projects contained numerous falsehoods as to how their investment money would be spent, most of which actually went to Celani, Binder, and their salespersons.

The business fraud scheme centered on the establishment of an overnight package delivery service, Kayport Package Express. In December 1982, CCA offered a new tax shelter to investors, Kayport Grid Systems, which was purportedly a computerized package sorting and routing process able to greatly reduce the time and costs of current overnight package delivery systems. CCA claimed in its circulars to its investors that Kayport Grid Systems already had a buyer, Kayport Package Express, a division of CCA. Except for a name, it appears that Kayport Package Express had no other attributes of existence at this time.

In January 1983, the defendants met with a number of businesspersons and state and local officials in Springfield, Illinois to discuss the possibility of locating Kayport there. At a meeting on January 10, the defendants represented that CCA had already developed the computer system and purchased delivery vehicles and airplanes. The defendants also stated that they would not seek any financial assistance from the state or local government, but would rely solely on CCA to fund the venture. The defendants then announced

that Kayport would locate in Springfield and begin operations March 1, 1983.

Despite their representation that CCA would wholly fund Kayport, CCA salesmen sold over $250,000 worth of stock in Kayport after the January 10 meeting. Further, Kayport investors were told that the State of Illinois and City of Springfield were providing Kayport with financial assistance, that the computer system was already developed, and that Kayport owned a fleet of delivery vehicles and airplanes. In actuality, neither CCA nor Kayport had developed a computer system and Kayport owned no delivery vehicles or airplanes. Kayport began its "operations" on March 1, 1983 with rented planes and equipment and was out of business by March 4.

## II.

■ Binder contends that the government illegally seized documents from the Kayport and CCA offices that were later used to incriminate him. The seizures occurred after grand jury subpoenas were issued for the documents, and the government conducted searches of both offices without a warrant because each premises appeared to have been abandoned. At a pre-trial suppression hearing, the trial court concluded that the Kayport and CCA offices had indeed been abandoned at the time of the searches and denied Binder's motion to exclude the seized documents from evidence. Binder appeals this ruling.

In the widely followed case of *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973), the Fifth Circuit stated that "[a]bandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts." 474 F.2d at 176. The *Colbert* court further stated that

[t]he issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of

privacy with regard to it at the time of the search.

*Id.* at 176. The trier of fact's finding that property has been abandoned is reviewable under the clearly erroneous standard. *See United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.1983) (citing *United States v. Diggs*, 649 F.2d 731, 735 (9th Cir.), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981)).

We first turn to the facts presented at the suppression hearing by the government relating to its warrantless search of the Kayport office on May 17, 1983. Kayport was in "business" for only four days, from March 1 until March 4, 1983. The following Monday, March 7, Celani assembled the employees and informed them that they were laid-off, effective immediately. Celani told them that they would be paid, but they never were. On March 8, Kayport's creditors and the lessors of its equipment repossessed equipment and supplies from the office. On March 9 or 10, Kayport's Director of Security turned over the office keys to the airport management and made arrangements to surrender Kayport's business vehicles to the local credit bureau. Kayport never paid any rent for the office to the airport management.

Before leaving Springfield on or about March 7, Celani removed several boxes of records from the office and the contents of his desk and the company safe. He also consolidated Kayport's four bank accounts into one and withdrew more than $8,000 for himself and his girlfriend. Finally, Celani moved out of his Springfield residence, shipping all of his belongings to Los Angeles. He never returned to Springfield or contacted any of Kayport's employees after leaving, and Kayport never resumed operations.

■ The government searched the CCA offices in Sherman Oaks, California on April 6, 1983. On March 8, Binder informed all CCA employees that they were dismissed. The following week, CCA requested use of the night elevator from the building manager in order to move out of the premises. The building manager then

inspected the offices. Prior to the search, he informed government agents that the offices were "vacant" and that CCA had moved out of the building during the week of March 14. Sometime thereafter the landlord changed the locks on the office doors. At the time CCA left the offices, it was over $13,000 in arrears for February and March rent. On March 22, Celani filed change of address cards with the post office for CCA, Binder, and himself and requested that all mail delivered to the former CCA offices be forwarded to a mail receiving service. He also wrote to all the investors in CCA's "tax shelters" and notified them that CCA was "changing quarters and telephones."

Binder did not dispute any of these facts at the suppression hearing; he disputed only their interpretation. He also offered additional testimony which he contends proved that he and Celani intended to continue their business operations and had only temporarily shut down Kayport and CCA. The day before Kayport ceased operations, Binder went to New York. He testified that his purpose in doing so was to obtain additional financing for Kayport. He also testified that he was attempting to find a buyer for Kayport. Finally, Binder asserts that his filing of a Chapter 11 bankruptcy petition for Kayport on March 15 and 17, 1983 belies any intention to abandon the Springfield office.

Similarly, Binder contends that filing a bankruptcy petition for CCA on March 24th was inconsistent with an intent to abandon the Sherman Oaks office before it was searched. Binder further contends that he attempted to gain access to the Sherman Oaks office after March 14th but was locked out because the locks had been changed. He also asserts that the facts that office furniture and equipment remained in the office and the telephone was still hooked up indicate that the office had not been abandoned.

After reviewing the evidence presented at the suppression hearing, we conclude that it was not clearly erroneous for the trial judge to find that both the Kayport

and CCA offices had been abandoned prior to the dates on which they were searched. The government's evidence showing an intent to abandon the offices was substantial and we are not persuaded that Binder retained a reasonable privacy interest in either office or, *a fortiori*, the contents therein. Binder's argument that abandonment was not proved consists almost entirely of an innocent interpretation of much of the government's evidence. The trial judge was not required to accept this interpretation of the facts, and clearly he did not. The trial judge stated:

> I do not believe Mr. Binder or his attorney from California when they make the subjective statement that their intention was to reorganize the business. I view that as a smokescreen.... [A]ll these subsequent protestations ... I view as subterfuge and an attempt to deny what is obvious and what is obvious is that they abandoned the enterprises and the books, records, and materials that were there.

TR. 87–88 (May 30, 1985). The credibility of witnesses at a suppression hearing is a matter for the trial judge to determine, and his credibility findings will not be reversed unless they are clearly erroneous. *United States v. Hendrix*, 752 F.2d 1226, 1230 (7th Cir.1985). We do not find that the trial judge was clearly erroneous in disbelieving a defendant and his witness who "ha[d] every motive to make statements that [were] beneficial to them [and] self-serving." TR. 87 (May 30, 1985). We therefore affirm the trial court's denial of Binder's motion to suppress the evidences seized in the searches of the Kayport and CCA offices.

### III.

■ Binder contends that the trial court abused its discretion in denying his motion to transfer venue from Illinois to California. Binder complains that he was unable to subpoena witnesses on his behalf from California because of the expense of bringing them to Illinois to testify, and he asserts that this violated his rights to due process and a fair trial. Binder also con-

tends that other factors militated in favor of trying the case in California. We do not find that the trial judge abused his discretion in denying Binder's motion for change of venue.

Of the 64 witnesses called by the government at trial, 28 were from California, 17 were from Illinois, and the remaining 19 resided in ten different states, including New York, New Jersey, and Florida, and one foreign country, England. Prior to trial, Binder proposed calling 22 witnesses on his behalf, 15 of whom lived in California or Las Vegas, Nevada. Of the remainder, two resided in New York, and one each in New Jersey and Michigan. The residences of three of these witnesses were not specified. At trial, Binder called four witnesses in his defense, none of whom lived in Illinois.

Based on these facts, we cannot say that the location of the proposed witnesses significantly favored conducting the trial in California. Although a substantial number of witnesses were from California, a substantial number were also from Illinois. Moreover, the widely scattered residences of the other witnesses, many of whom lived on or near the east coast, favored a central location for trial like Illinois rather than a far western location like California. Further, we find no prejudice to Binder's rights to due process or a fair trial due to the expense of nonresident witnesses traveling to Illinois to testify. If Binder was actually without funds to bring his witnesses to Illinois, the government would have paid their expenses. *See United States v. Zylstra*, 713 F.2d 1332, 1336 (7th Cir.), *cert. denied*, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983). As we find in the following section of this opinion, however, Binder failed to prove he was unable to pay for the expenses of his witnesses himself. Binder's argument that other factors required trying the case in California do not merit discussion. We therefore affirm the trial court's denial of Binder's motion for change of venue.

## IV.

Celani and Binder both contend that the trial court erred in denying their motions to be provided numerous services at the government's expense, including the issuance of subpoenas and the appointment of counsel, a mechanical engineer (despite the illustriousness of Celani's alleged academic credentials in this area), a tax shelter expert, an investigator, and a court reporter. The trial court concluded that neither defendant made a sufficient showing of financial inability to provide these services for himself and denied these motions. We affirm these rulings by the trial court.

On May 21, 1984, the court held a hearing to determine Celani's financial inability to hire his own counsel. Celani was represented by court-appointed counsel at that hearing and presented a one-page form affidavit in support of his motion for appointed counsel. The affidavit represented that Celani was unemployed but had last worked in May 1984 for $120 a month, had no other income during the past year other than his wife's income of $280 a month, lived with his in-laws, owed over $100,000 to creditors, and had no cash, real estate or other valuable property.

The government presented evidence at this hearing that cast Celani's financial status in a considerably less dreary light. In March 1983, Celani claimed a net worth of over $19 million. Between September 1982 and September 1983, Celani bought over $345,000 in gold and silver, of which the whereabouts of some 570 Kruggerands was a mystery. Celani received over $265,-000 between 1981 and 1983 from his corporate accounts. In 1982 and 1983 Celani purchased several luxury automobiles, a boat, $13,445 worth of stock, a Rolex watch worth over $2,000, and a diamond ring worth $3,780. At the conclusion of the hearing, the trial court stated that the government had raised a doubt as to Celani's inability to pay for his own counsel and held that Celani had failed to present sufficient evidence to justify the appointment of counsel.

Although given leave to do so by the court, Celani repeatedly refused to offer any further evidence of his financial status, even when he later petitioned the court for the issuance of subpoenas and the appointment of a tax shelter expert, an investigator, and a court reporter at the government's expense. These motions were also denied because he failed to show he was unable to pay for these services. The court had appointed counsel for Celani for all of these pre-trial motions and for an interlocutory appeal, see *United States v. Celani*, 748 F.2d 363 (7th Cir.1984), which did not decide any of the issues raised by this appeal. At the final pre-trial conference Celani moved to proceed *pro se*. The court granted this motion but allowed Celani's former appointed counsel to assist him in an advisory capacity.

Binder had hired his own counsel and had paid him a retainer of $14,500, but moved for the appointment of counsel on January 24, 1985, stating that he had been unable to work since his indictment and had no further money to pay his attorney. The motions for the other services listed above followed shortly thereafter. The court denied these motions at a hearing on January 31, 1985 when Binder refused to be examined about his financial condition. Binder contested this ruling, demanding that he be allowed to prove his financial inability *ex parte*. In view of the government's motion for further inquiry into Binder's finances, the court refused, and on April 9 Binder's counsel moved to withdraw from the case. The court granted the motion, but appointed Binder's counsel to represent him after Binder again insisted that he was financially unable to pay a lawyer, noting that the government could attempt to recoup this expense from Binder at the conclusion of the trial.

Shortly thereafter, Binder again resubmitted his motions for the services listed above, except for appointment of counsel. This time, however, he agreed to an adversarial hearing as to his financial inability to pay for these services. The hearing was held on June 18, 1985, and Binder submitted exhibits, testified, and was cross-ex-

amined. A financial affidavit represented Binder's net assets to amount to over $600,000 in February 1983. The affidavit stated that Binder owned $90,000 cash and $140,000 in gold and silver. The government presented further evidence that Binder owned $210,000 in gold and silver. Binder testified that he spent all his cash between the time of his indictment in March 1983 and the hearing and that, although he admitted purchasing $70,000 worth of Kruggerands on March 8, 1983, all the gold and silver he owned had been subsequently sold to repay a bank loan. The February 1983 affidavit also stated that Binder owned $25,000 worth of jewelry, paintings, and furniture. Binder testified that he had given his jewelry away to his ex-wife and girlfriend, that he did not know how much the paintings were worth, and that the furniture was worth only $2,000. In September 1983, Binder purchased $18,000 worth of limited partnership offerings from a company he worked for after March 1983, and also testified that he loaned the company $57,000 and his daughter $20,000 after he was indicted. Binder testified that he did not remember where he got the money for the Krugerrands he purchased on March 8, 1983, the limited partnership offerings, the $57,000 loan or the loan to his daughter. At the conclusion of the hearing, the trial judge stated: "... I find Mr. Binder's responses evasive and disingenuous on what happened to cash assets of approximately $210,000." The court denied Binder's motions, stating that "the defendant has not persuaded the court that it is more probably true than not that he is financially unable to obtain investigative experts on other services necessary for an adequate defense."

A trial court's denial of a motion for appointed counsel pursuant to 18 U.S.C. § 3006A will not be reversed on appeal unless clearly erroneous. *See United States v. Harris*, 707 F.2d 653, 662 (2nd Cir.), *cert. denied*, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983). Similarly, the denial of a motion for other services at the government's expense under Rule 17(b) will

be reversed only for an abuse of discretion. *See United States v. Stoker,* 522 F.2d 576, 578 (10th Cir.1975). Both provisions require the defendant to make a "satisfactory showing" that he is unable to pay for these services himself. *See Harris,* 707 F.2d at 662 (construing Section 3006A); *Stoker,* 522 F.2d at 578 (construing Rule 17(b)). See also *United States v. Kelly,* 467 F.2d 262, 266 (7th Cir.1972), *cert. denied,* 411 U.S. 933, 93 S.Ct. 1905, 36 L.Ed.2d 393 (1973) (construing Section 3600A).

In view of the facts recited above, we hold that the trial judge's denial of appointed counsel for Celani was not clearly erroneous. We further hold that the trial judge did not abuse his discretion in denying both defendants the other services they requested. The government presented evidence that both defendants possessed substantial assets immediately prior to their indictment, engaged in a flurry of dubious financial activity after their indictment, and mysteriously could not account for either the source or the destination of large sums of money and valuable assets. Celani did not even attempt to rebut the government's evidence that he possessed substantial assets, and Binder's testimony in rebuttal of the government's evidence was "evasive and disingenuous." The trial court's denial of these motions is therefore affirmed.

### V.

Binder contends that the testimony of a witness on his behalf, Richard Funess, was erroneously excluded. Funess testified in an offer of proof that he spoke with Binder on the day that Binder returned to Los Angeles from his trip to New York, the trip Binder allegedly took to get financing for Kayport. Funess testified that Binder told him: "I don't know what happened, I'm in a total daze." Funess further testified that Binder then explained to him that he had gone to New York to get financing for Kayport and that while in New York Celani interrupted a meeting to tell him that Kayport had collapsed and that "the deal was off." Binder sought to admit this testimony into evidence under Rule 803(3), the present sense impression exception to the hearsay rule, as evidence of Binder's lack of intent to defraud with respect to the Kayport scheme. The trial judge ruled that this testimony was inadmissible because the statements relating to Binder's state of mind were made after the Kayport scheme had ended and were therefore irrelevant to his intent to defraud during the course of the scheme. The court further stated that the statements about Binder not knowing what happened and being in a daze did not "show anything as to the personal intent of the declarant."

A trial court's evidentiary rulings will not be overturned on appeal "absent a clear showing of abuse of discretion." *United States v. Harris,* 761 F.2d 394, 398 (7th Cir.1985). Funess's testimony about Binder's explanation to him of why he was "in a daze" was plainly inadmissible hearsay. Rule 803(3) provides an exception only for statements "of the declarant's then existing state of mind, emotion, sensation, or physical condition." Binder's recitation of the events in New York to Funess did not fall within any of these categories. Binder's statements to Funess that he was "in a daze" and "did not know what had happened" do relate to his state of mind. We do not find, however, that the trial judge erred in excluding these statements on the grounds of relevancy. *See United States v. Jackson,* 780 F.2d 1305, 1315 (7th Cir. 1986) (statements proffered under Rule 803(3) must be relevant to an issue in the case). Even if we were to accept Binder's tenuous position that these statements of his present state of mind were relevant to prove his past state of mind, a position the trial judge rejected, the statements were so vague and inconclusive as to Binder's earlier intent to defraud that we cannot say the trial judge clearly abused his discretion in excluding them from evidence. Moreover, even if this evidentiary ruling was incorrect, we are convinced that a single error of this type in a case that lasted over two weeks and included the testimony of over 65 witnesses was harmless error beyond a reasonable doubt.

## VI.

Celani also contends that a number of the trial court's rulings on various matters were erroneous and further asserts that the evidence at trial was insufficient to sustain his convictions. With one inconsequential exception, Celani's attorney did not even make the effort to include any legal argument with these contentions. Celani's attorney merely lists, in the literal sense of the word, fourteen objections, not including subparts, to the trial judge's conduct of the case. These objections consist almost entirely of broad, unsupported assertions, such as "the court erred in denying all of defendant's pre-trial motions" and "[a] conspiracy is [sic] not shown as a matter of law based on the testimony of the witnesses and the circumstantial evidence adduced at trial." As a final precaution, Celani's brief included the all-encompassing objection that "[t]he court erred in denying all other defense motions and objections of record which are not specifically enumerated herein, which denied defendant due process of law and a fair and impartial trial." If these objections are an invitation to the court to scrutinize the record so that we can make legal arguments in favor of Celani and then rule on them, we respectfully decline. Of several things we are certain: these objections do not frame legal issues capable of an answer by the government or of review by this court and do not rise to the distinction of appellate advocacy. We will address them no further.

The convictions of Binder and Celani are AFFIRMED.