**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Judith E. WHITE and Richard L. White, Defendants–Appellants.**

**Nos. 88–1925, 88–1926.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1988.

Decided July 18, 1989.

Linda L. Pence, Indianapolis, Ind., for defendants-appellants.

Royal B. Martin, Jr., Silets & Martin, Ltd., Chicago, Ill., Linda S. Chapman, Amarillo, Tex., for plaintiff-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior District Judge.*

POSNER, Circuit Judge.

Richard White and his wife Judith were convicted of bankruptcy fraud in violation of 18 U.S.C. § 152. Mr. White was fined $25,000 and given a short prison sentence, which the judge suspended; both Whites were ordered to provide community service for several months.

Richard White ("White") was a principal of a corporation named White Petroleum, which owned gas stations in Indiana and Ohio. Mrs. White, a nurse, was not directly involved in her husband's business activities. In 1983 White Petroleum declared bankruptcy, pulling the Whites down with it because they had made personal guarantees of several million dollars to the corporation's creditors. White retained the Indianapolis law firm of Bamberger & Feibleman, which had represented the corporation in its bankruptcy proceeding, to represent him and his wife in their personal bankruptcies. A partner in Bamberger & Feibleman who worked on both the corporate and the personal bankruptcies, Mark Center, met with White in March 1984. At that meeting, according to White, a decision was made to list on the Whites' asset statement a $10,000 loan that White had made to Twin Flags Trucking Company as a capital contribution having no present value rather than as a receivable, and in addition Center opined that certain life insurance policies owned by White were exempt property. Mrs. White was not present at this or any other meetings at which bankruptcy was discussed.

The personal bankruptcy petition was filed in December 1984, and in May of the following year the Whites were discharged from bankruptcy because the trustee concluded that there were no assets available for unsecured creditors. Two years later Mark Center was convicted of bankruptcy fraud in an unrelated matter and shortly afterward the government solicited him to help it obtain information on still another matter. Unable to assist the government with that matter Center volunteered that he had information that fraud had been committed in the Whites' bankruptcy. The government was interested and Center agreed to assist. To that end (though apparently not at the government's direction), he went to the offices of Bamberger & Feibleman, with which he was no longer affiliated, and copied a number of documents from the Whites' file. These he gave, through his counsel, to the government. Center later testified before the grand jury that was considering whether to indict the Whites, but he did not testify at their trial.

* Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

The charge against the Whites was that in their petition for bankruptcy they had willfully listed a phony third mortgage on their house and had willfully concealed several assets, including three life insurance policies, the $10,000 loan, and some stock in a local bank. The district judge denied the Whites' request to examine the documents that the government had obtained from Mark Center, after the government assured the judge that it had not sought to place any of those documents in evidence and in addition submitted an affidavit stating that it had not received any privileged documents from Center. The government did not show the judge any of the documents it *had* received from Center.

The Whites argue first of all that there is no proof they read the bankruptcy petition before signing it. It is of course true that many people sign documents—even solemn documents reciting that the signer signed with knowledge of the contents and under penalty of perjury (and the Whites' bankruptcy petition contained such a recital, right above their signatures)—without reading them. This is a fact of life for a jury to consider in determining how likely it is that a defendant who signed a document knew what was in it. The cases rather confusingly say on the one hand that "proof of a signature alone ... is insufficient by itself to make knowledge of the contents ... attributable to the signor," and on the other hand that "the signature ... is *prima facie* evidence that the signor knows the contents." *United States v. Harper,* 458 F.2d 891, 894–95 (7th Cir.1971); see also *United States v. Bass,* 425 F.2d 161 (7th Cir.1970); *United States v. Tolkow,* 532 F.2d 853, 857 (2d Cir.1976). This makes it sound as if a jury both may not infer knowledge from the signature alone and may. But the confusion is semantic rather than substantive. There always is more evidence than the signature—evidence at the very least of the nature and length of the document—and the issue should be whether the total circumstances, including but not limited to the bare fact of the defendant's signature, warrant a confident inference that the defendant knew what he was signing, see, e.g., *United States v. Bessesen,* 445 F.2d 463, 471 (7th Cir.1971), or, what has the same legal significance, deliberately refused to acquaint himself with the contents, fearing what he would discover if he did, see, e.g., *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.1985).

In the case of Mr. White, the circumstances enable the necessary inference of knowledge or reckless indifference to be drawn. He met with bankruptcy counsel to prepare both the corporate and the personal bankruptcy petitions. He knew he would have to meet with his creditors, to be examined under oath regarding the truth of the petition. See 11 U.S.C. §§ 341, 343. He was an experienced businessman who handled all the financial affairs of his household. It was not a case of a single oversight. There was sufficient evidence to establish beyond a reasonable doubt that White was aware of the contents of the petition.

But there was insufficient evidence with regard to Mrs. White, and she must therefore be acquitted. There is no evidence that she was involved in her husband's business affairs, knew anything about them, or took any interest in them. One of the government's own witnesses testified that Mrs. White had signed documents (a mortgage and a personal guarantee) without, so far as this witness was aware, reading them. She attended none of the meetings at which her husband discussed the bankruptcy petition with the lawyers. It is true that one of the assets concealed was an insurance policy on her own life, but this suggests only that if she had read the petition she might have noticed an omission. It is true, too, that her signature appears not once but several times, on different documents attached to the petition—but not on the pages listing the petitioners' assets. There is no evidence beyond the inference that can be drawn from her signatures that she did read the petition and accompanying schedules. In the circumstances—having regard for the nature of the bankruptcy-petition form, the circumstances in which she had previously signed documents involving her

husband's business, and the nature of her own occupation—the inference cannot be drawn with the confidence required in a criminal case.

▬ That leaves us with a number of other issues raised by Mr. White, but only two have sufficient merit to require discussion. The first is whether the indictment was "duplicitous" in combining a number of fraudulent omissions from the bankruptcy petition in a single count. The argument that it was is that the jury may not have been unanimous with regard to any specific omissions—it is possible, for example, that three jurors may have been utterly convinced about one of the omissions, two others about another, the other seven about a third. That is a danger, but on the other side is the danger that if every omission is a separate count, a single fraudulent scheme could give rise to a staggering number of separate convictions. The statutory offense is bankruptcy fraud, and the grand jury is not obliged in our view to place every piece of the fraud in a separate count. No more is the petit jury required to agree on every detail, provided they are unanimous in believing beyond a reasonable doubt that the defendant committed the fraud. Cf. *United States v. Markowski*, 772 F.2d 358, 364 (7th Cir.1985); *United States v. Balistrieri*, 779 F.2d 1191, 1224 (7th Cir.1985).

The few cases on point support our conclusion, treating the fraudulent nondisclosure of several items of property in the petition for bankruptcy as a "single continuous concealment" constituting a single offense. *Tugendhaft v. United States*, 263 Fed. 562, 563 (5th Cir.1920); cf. *United States v. Berardi*, 675 F.2d 894, 898 (7th Cir.1982). "Surely, if an accused should conceal a dining room set, a china set, or one thousand silver dollars belonging to the estate of the bankrupt, his offense of failure to reveal or disclose would not be multiplied by the number of separate items concealed." *Edward v. United States*, 265 F.2d 302, 306 (9th Cir.1959). And would the dining room set be a single item, or the number of separate pieces of furniture in the set? "[T]he duty to disclose ... is a single duty to reveal all." *United States v. Moss*, 562 F.2d 155, 160 (2d Cir.1977). The fact that here a single form was involved supports this conclusion. Cf. *United States v. Hawkins*, 794 F.2d 589 (11th Cir. 1986). Although we can find no cases on the point, we have no doubt that plural fraudulent omissions in a single federal income tax return are one offense rather than as many offenses as there are omissions; and we know that tax evasion committed over several years can be charged as a single continuous course of evasion, see *United States v. Johnson*, 319 U.S. 503, 513–15, 63 S.Ct. 1233, 1238–39, 87 L.Ed. 1546 (1942); *United States v. Shorter*, 809 F.2d 54, 56–58 (D.C.Cir. 1987).

*Moss* draws what at first glance may seem an arbitrary distinction between nondisclosure in the initial petition and later. "When the concealment of assets belonging to the bankrupt occurs after a receiver or Trustee has been appointed, however, each separate act of concealment is a separate violation of the statute." *Id.* But as the court explains, "in each such instance there is a separate act, taken at a discrete time, accompanied by the requisite intent." *Id.*; see also *United States v. Melton*, 763 F.2d 401 (11th Cir.1985) (per curiam). "Any other rule," the court in *Moss* continued, "would permit a defendant who has committed a first concealment to steal more on the theory that he would never become a sheep but always remain a lamb." 562 F.2d at 160. The same, though, is true of the pre-filing concealment; if the defendant plans to omit one asset, he won't incur additional criminal liability by omitting others. But there is a difference between the two cases. It is the distinction between an act of omission and an act of commission—a distinction perhaps too much derided. It is easier to determine whether someone hit X than whether someone failed to rescue X; and the difference is a clue to the law's differential treatment of inflicting harm and failing to rescue from harm. It likewise is easier to imagine every separate act of concealment as a separate crime than to imagine every piece of information omitted from a form as a separate crime. We need

not explore the possible tension between *Moss* and the tax-evasion cases cited earlier.

■ The second noteworthy issue raised by White is the government's refusal to allow his attorney to examine the documents that the government had obtained from Mark Center. Even if, as the government argues, none of the documents was introduced in evidence, some of them may, for all that appears, have provided leads to evidence that the government did use. The threshold question is, so what? If the government did obtain leads from the documents, did that violate any right of White's? White suggests three possibilities. The first is that if any of the leads resulted from statements made by White to Center and reported in the documents, such use of the statements may have violated his Fifth Amendment right against compulsory self-incrimination. However, by failing to raise this issue other than by a passing reference in a footnote, White has waived it. See, e.g., *Pearce v. Sullivan*, 871 F.2d 61, 64 (7th Cir.1989); *Bonds v. Coca–Cola Co.*, 806 F.2d 1324, 1328 (7th Cir.1986). Although the cases establishing this precept are civil cases, we have deemed it applicable to criminal cases as well. See *United States v. Williams*, 877 F.2d 516, 518 (7th Cir.1989); *United States v. Binder*, 794 F.2d 1195, 1203 (7th Cir. 1986); *United States v. Mealy*, 851 F.2d 890, 909 (7th Cir.1988) (dictum). Second, White argues that the use of documents obtained from his (former) attorney infringed his Sixth Amendment right to counsel. This argument has no merit, because Center was not representing White in the criminal matter and because that matter had not yet proceeded from the investigative to the accusatorial stage. See *Moran v. Burbine*, 475 U.S. 412, 432, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Third, White argues that the government may have violated the attorney-client privilege by making use (if it did make use) of information that he had given his attorney, Center, and that if so the government violated the due process clause of the Fifth Amendment as well. Surprisingly, the government does not argue that the privilege was unavailable to White because the disclosures he made to Center were fraudulent. See *United States v. Zolin*, —— U.S. ——, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

■ Given this waiver by the government, the third argument has *potential* merit, though no more. Although White could have prevented the admission of any testimony by Center that violated the attorney-client privilege—that is what an evidentiary privilege *means*—Center did not testify at White's trial, and it is far from clear that the proper remedy for a violation of the attorney's duty of confidentiality is exclusion from the client's criminal trial of probative evidence obtained as an indirect consequence of that violation. Exclusionary remedies are strong medicine, normally reserved for constitutional violations and challenged even there, and when the attorney is not the defendant's criminal defense attorney there is, as we have just seen, no Sixth Amendment issue. (And there is no constitutional right to counsel in civil cases on which to hang a *constitutional* attorney-client privilege.) If, however, the government, having the kind of hold over an attorney that it had over Center—for when it approached him he had been convicted but not yet sentenced—extracts from him client secrets that it then uses in a criminal trial of the client to the latter's substantial prejudice, this *might* be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment. So at least a number of cases suggest. See *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir.1977); *United States ex rel. Shiflet v. Lane*, 815 F.2d 457, 465–66 (7th Cir.1987); *United States v. Fortna*, 796 F.2d 724, 733 (5th Cir.1986); *United States v. Rogers*, 751 F.2d 1074 (9th Cir.1985). The fact that in this case no privileged documents were actually introduced in evidence (and this we have only on the government's say-so) need not be crucial on the theory of these cases, if privileged documents or other privileged communications were used to obtain evidence that *was* placed in evidence—a matter on which the government's affidavit is silent. All we know is that the government claims not to have introduced any privileged documents into evidence.

We do not want to decide a constitutional issue unless we have to, and we may not have to, since the government may have made no use of privileged documents in this case. We would also prefer to resolve the issue on a full record. To resolve the threshold factual questions the case must be remanded for appropriate proceedings in the district court to determine, first, whether the government procured or was otherwise complicit in a violation of the attorney-client privilege and, second, if so, whether the violation resulted in the introduction of evidence sufficiently material and adverse to White that the failure to exclude it denied him his basic procedural rights.

The district judge may if she wishes conduct an initial *in camera* examination of the documents that the government obtained from Mark Center and of the transcript of his grand jury testimony before deciding whether an evidentiary hearing (at which materials submitted to the grand jury could be disclosed to the defense pursuant to Fed.R.Crim.P. 6(e)(3)(C)(i) and (ii)) is necessary to resolve the issue. If she decides there was no error of constitutional magnitude, the conviction of White will stand, subject of course to his right to appeal from her determination. If she decides there was constitutional error, the government will be able to appeal and challenge the proposition that a violation of the attorney-client privilege by the government can in an egregious case violate not the Sixth Amendment right to counsel, which as we have emphasized is not in issue here, but the Fifth Amendment right to due process.

To summarize, the judgment against Judith White is reversed with directions to acquit her, and the case against Richard White is remanded for further proceedings consistent with this opinion.

REVERSED IN PART, AND REMANDED IN PART.

WILL, Senior District Judge, concurring in part and dissenting in part.

I concur in most of the court's opinion. Specifically, I agree that there was suffi-cient, though by no means overwhelming, evidence from which the jury could have concluded beyond a reasonable doubt that Mr. White knew the bankruptcy petition was incomplete and that his explanation as to the reasons for the omissions was not credible. It should be noted in this connection, however, that his explanation was largely that he relied on advice of his counsel, Mark Center, who was convicted of an unrelated bankruptcy fraud and was obviously capable of committing and counselling such fraud.

I also agree that as to Mrs. White although the jury found her guilty, there was insufficient evidence to sustain that verdict and it must be reversed. I agree as well that the indictment was not duplicitous in combining a number of allegedly fraudulent omissions in one count.

As to the question of the government's use of Center as the source of the information on the basis of which the Whites were indicted and convicted, I also agree that, since in the criminal proceedings he was not counsel for the Whites and because the case was still in the investigative stage, there was no violation of their Sixth Amendment right to counsel. The Whites were discharged and the bankruptcy proceedings concluded in May of 1985, Center was not convicted until March 1987 and apparently did not represent the Whites after their discharge.

Finally, I agree that the case against Richard White should be remanded for further proceedings. It is only with respect to his Fifth Amendment claims and particularly the steps to be taken by the trial judge to resolve them that I find myself in disagreement with the majority. As the majority opinion points out, after Center's conviction for bankruptcy fraud in an unrelated matter but before sentencing, the government solicited him to help obtain evidence on another matter. He apparently tried to assist the government and presumably himself by so doing but was unsuccessful. He then told the government, which apparently had no prior knowledge

of the matter, that he had information that fraud had been committed in the Whites' bankruptcy. With the government's knowledge (since it received the files), though apparently not at its direction, Center went to the offices of Bamberger and Feibleman and removed or copied a number of documents from the Whites' file and turned the documents or copies over to the government. Thereafter, Center apparently had additional meetings with government counsel in order to prepare for his testimony before the grand jury on September 24 and again on October 22, 1987. The record before us is devoid of any information as to (1) what Center said to government counsel in any of their meetings or even how many meetings were held, (2) what documents he stole from the Bamberger and Feibleman files and turned over to the government or (3) what he testified to before the grand jury. Given the fact that the government apparently had insufficient information on which to prosecute the Whites before Center's cooperation, it seems likely that he both breached the Whites' attorney-client privilege and incriminated them by the stolen information he turned over since it apparently enabled the government to indict and convict them.

When defense counsel raised the question of the government's conduct and its refusal to permit counsel even to examine the stolen documents and moved for an evidentiary hearing to determine whether the Whites' Fifth and Sixth Amendment rights had been violated, the government responded, not that at trial or before the grand jury it had introduced none of the documents obtained by Center's theft or any incriminating information obtained from him either in their conferences or from the documents, but only that at trial it had introduced no privileged documents. The trial judge denied the motion for a hearing "as a matter of law" on the ground that the Whites had pointed to no privileged documents which had been introduced in the trial.

That holding, as the majority impliedly concedes, does not comport with current case law. The test is not simply whether privileged documents were introduced at trial but whether any privileged information, documentary or otherwise, was given to the government and used to secure the indictment or at trial. *See Weatherford v. Bursey,* 429 U.S. 545, 552, 97 S.Ct. 837, 842, 51 L.Ed.2d 30 (1976); *United States v. Fortna,* 796 F.2d 724, 731 (5th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *United States v. Judson,* 322 F.2d 460, 466 (9th Cir.1963) (when client's privileged information is in the possession of an attorney its production may not be compelled or used by the government).

As the majority opinion recognizes, there are two potential Fifth Amendment violations here. The first is that Center's disclosures to the government, either orally or through documents, of statements made by White to him may have violated White's Fifth Amendment rights against self-incrimination. This is obviously a serious possibility since, as previously pointed out, the government apparently had insufficient evidence incriminating the Whites before Center's disclosures and thereafter had sufficient evidence to indict and convict them.

The majority disposes of this potentially serious violation by finding that, since it was only specifically raised in a footnote, "White has waived it." *Ante* at 1513. It should first be noted that White's counsel asserted that the government's conduct violated White's Fifth and Sixth Amendment rights. He emphasized that, in violating the attorney-client privilege by securing information from Center and using it to indict and convict White, the government had violated the due process clause of the Fifth Amendment, the second potential violation here involved. I cannot agree that we can or should under the waiver doctrine dispense with White's argument based on his Fifth Amendment right against self-incrimination.

First, I find that the cases cited by the majority are factually distinguishable from the one before us. The majority cites three criminal cases in support of its waiver argument. In *United States v. Williams,*

877 F.2d 516, 518 (7th Cir.1989), and *United States v. Binder*, 794 F.2d 1195, 1205 (7th Cir.1986), the defendants had made only conclusory and unsupported allegations of error apparently inviting the reviewing courts to search the records and provide legal arguments to show error. In *United States v. Mealy*, 851 F.2d 890, 909 (7th Cir.1988), the court noted a potential argument to show ineffectiveness of counsel which the defendant had not raised at all and had, therefore, waived. In contrast, in the present case, White identified a potential Fifth Amendment right against self-incrimination violation based on the breach of the attorney-client privilege. His failure to provide any specific legal authority for this argument is explained, in part, by the fact that he focused on the need for a hearing to determine whether the privilege had even been breached. *See* Brief of Defendant–Appellant at 40–42. In addition, White had argued in his Motion to Dismiss the Indictment or, in the Alternative, to Suppress Evidence that his right against self-incrimination had been violated. In the context of a trial, waiver of a constitutional privilege or right requires evidence of a knowing and intentional decision to waive. *See United States ex rel. Williams v. DeRobertis*, 715 F.2d 1174, 1178 (7th Cir.1983) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)), *cert. denied, Williams v. DeRobertis*, 464 U.S. 1072, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984). I would not, therefore, find waiver based on the fact that the defendant (or more accurately, his counsel) alleged a constitutional violation on two grounds, emphasizing one and referring to the other by means of a footnote.

With respect to whether or not the government's conduct violated White's privilege against self-incrimination, it is clear that White was not directly compelled to produce incriminating documents and other information to his attorney, Mark Center. *See Fisher v. United States*, 425 U.S. 391, 401, 96 S.Ct. 1569, 1576, 48 L.Ed. 2d 39 (1976) ("the Fifth Amendment protects against 'compelled self-incrimination, not [the disclosure of] private information'") (citation omitted). However, it is also clear that Mr. White had to communicate with his attorney in order to obtain representation in his bankruptcy. In order to protect the traditional purpose of the attorney-client privilege—"to encourage clients to make full disclosure to their attorneys"—the *Fisher* Court held that an attorney is not bound to produce documents if the client would be privileged from production. *Id.* at 403–05, 96 S.Ct. at 1577–78.

Although there is apparently no general Fifth Amendment protection for papers, *see United States v. Doe*, 465 U.S. 605, 610–12, 104 S.Ct. 1237, 1240–42, 79 L.Ed.2d 552 (1984) (Fifth Amendment protection does not extend to business records, even though held personally by the party claiming the privilege), that amendment must protect at least incriminating conversations and documents produced for the purpose of representation, whether held by the attorney or client. *See United States v. Davis*, 636 F.2d 1028, 1041 (5th Cir.) (finding that the *Fisher* requirement that a document privileged in the hands of an attorney be privileged in the hands of the client is inapplicable where the communications for the purpose of representation were not pre-existing records), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). Absent such protection, a party is forced to choose between free communication with an attorney or complete silence based on the Fifth Amendment, a choice which one should not have to make and which the decided cases make clear one does not have to make. It is possible, of course, for a party to waive the Fifth Amendment, but it is clear that one is not forced to risk waiving the right against self-incrimination just to be able to speak to an attorney. Such a result conflicts with the purposes served both by the privilege against self-incrimination as well as the attorney-client privilege.

Given the fact that neither counsel for the defendant nor the trial court examined the documents in question nor are they available for our examination, there is no way of determining anything about them. Nor do we know if Center disclosed privileged and incriminating information to the

government in their various conversations prior to his testifying before the grand jury on two separate days. Given the fact that the information obtained from Center was apparently important to the indictment and conviction and may, for all we know, have been the only information the government had, at least at the outset, it is highly likely that it was incriminating of Mr. White or led to incriminating evidence.

It is hornbook law, of course, that an attorney may not waive the client's privilege. As indicated, there is a Fifth Amendment protection against the disclosure by an attorney of privileged incriminating information divulged by a client to the attorney for the purpose of representation. Whether or not that privilege was violated by Mark Center's conduct in this case depends, of course, on the nature and substance of Center's disclosures to the government. Since the trial judge declined to hold a hearing on the matter or to examine the documents or to permit defense counsel to do so and since Center's grand jury testimony is also not part of the record here, there is no way for us to determine if Mr. White's Fifth Amendment privilege was violated.

The second potential Fifth Amendment violation, as the majority recognizes, is that the government's conduct violated the due process clause of that amendment. The majority observes that if "the government, having the kind of hold over an attorney that it had over Center—for when it approached him he had been convicted but not yet sentenced—extracts from him client secrets that it then uses in a criminal trial of the client to the latter's substantial prejudice, this might be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment." *Ante* at 1513. *See United States v. Kleifgen,* 557 F.2d 1293, 1297 (9th Cir. 1977); *United States ex rel. Shiflet v. Lane,* 815 F.2d 457, 465–66 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); *United States v. Fortna,* 796 F.2d 724, 733 (5th Cir.1986); *United States v. Rogers,* 751 F.2d 1074 (9th Cir.1985).

The majority goes on to say that the mere fact that "no privileged documents were actually introduced in evidence (and this we have only on the government's say-so) need not be crucial ..., if privileged documents or other privileged communications were used to obtain evidence that *was* placed in evidence—a matter on which the government's affidavit is silent." *Ante* at 1513.

Having said all of the foregoing with which I agree, the majority then rightly says that the issue of whether the government made use of "privileged documents" should preferably be resolved on a "full record." It seems to me that a full record will require a hearing to determine not only what possibly privileged and incriminating information the stolen documents contained but also what similar information Center may have disclosed orally in the several conversations he apparently had with government counsel. Such a hearing should also explore what information concerning the Whites, if any, the government had before Center's disclosure, exactly what was said between government counsel and Center about how he was to obtain or did obtain the documents he turned over, and whether Center's grand jury testimony contained privileged information.

I am surprised, therefore, at the suggestion that the trial judge may conduct an *in camera* examination of the documents Center produced and his grand jury testimony and determine whether an evidentiary hearing in which defense counsel could participate should be held to resolve the issue. If, based on her examination of the documents and the grand jury transcript, she can determine that no error of constitutional magnitude occurred, the majority says, then there need be no hearing.

This procedure completely ignores the most probable means by which privileged incriminating information would have been disclosed by Center to government counsel, their conversations before Center's grand jury appearances. We do not even know how many such conferences there were, when they were held, how long they lasted

and above all, what Center said. I assume that the Assistant U.S. Attorney or whoever else was present at those conferences took notes which are still available to refresh the participants' recollections.

Moreover, only with a hearing in which defense counsel can participate and contribute to the resolution of whether or not his client's Fifth Amendment rights were violated can a "full record" be made.

I know of no way without a hearing that the trial judge or, ultimately, this court on appeal can determine if the government's conduct violated Richard White's Fifth Amendment rights. It is possible that government counsel had little information concerning the Whites' bankruptcy until Center, under pressure from government counsel, particularly after having failed in one effort to obtain evidence against someone else, suggested he might obtain incriminating evidence against the Whites. Government counsel and he may well have discussed how he was to obtain it, including rifling the files of his former law firm. In fact, this may well have been the only way he could have obtained the documents he turned over to the government. Apart from the question of privilege, these were stolen documents and the government in receiving them, if it knew how they were obtained, may well have been an accessory to their theft, if not before then after the fact.

On the other hand, Center may never have discussed how he was going to obtain evidence to be used against the Whites with government counsel. It is difficult to believe, however, that at no time did the government learn that the documents he turned over were either copied or removed from the Whites' file at the law firm.

Whatever the facts, they must be determined, a conclusion with which I believe the majority agrees. Without a hearing at which the facts can be fully explored, however, I do not see how that can be accomplished or a full record made from which an appellate court can review whatever determination the trial judge makes on the potentially serious constitutional questions here involved.

I would, therefore, remand for a hearing with no suggestion that the district judge can resolve the constitutional issues *in camera* while at the same time making a full record. I simply do not believe that is possible.