**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard L. WHITE, Defendant–Appellant.**

**No. 90–3073.**

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1991.

Decided Dec. 6, 1991.

Deborah J. Daniels, U.S. Atty. (argued) and Linda S. Chapman, Asst. U.S. Atty., Office of the U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Royal B. Martin, Jr. (argued), Hope L. Flack, Silets & Martin, Chicago, Ill. and Susan W. Brooks, McClure, McClure & Kammen, Indianapolis, Ind., for defendant-appellant.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Richard White and his wife Judith were both convicted of bankruptcy fraud in violation of 18 U.S.C. § 152, and they appealed. In our opinion found at 879 F.2d 1509 (7th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990), we reversed Mrs. White's conviction. As to Mr. White, we remanded his case for further proceedings. We asked the district court to determine, first, whether the government procured or was otherwise complicit in any violation of Mr. White's attorney-client privilege and, second, if so, whether such conduct resulted in the introduction of evidence sufficiently material and adverse to Mr. White that the failure to exclude it denied him his basic procedural rights. After an evidentiary hearing, the district court determined that the government was not complicit in any violation of Mr. White's attorney-client privilege, nor did any of the evidence introduced against Mr. White deny him his procedural rights.

In late 1984, Mr. and Mrs. White filed a personal bankruptcy petition. The petition was prepared by or under the direction of the Whites' attorney, Mark Center. At that time, Mr. Center was a partner of a law firm which represented White Petroleum, Inc., a corporation in which Mr. White and his brothers were involved. The corporation had become bankrupt in 1983. Richard and Judith White were discharged in their personal bankruptcy in May 1985.

In October 1985, the Federal Bureau of Investigation began investigating White Petroleum, together with some associated companies and individuals, including Mr. and Mrs. White, for possible bankruptcy fraud. In the course of the investigation, an FBI agent uncovered various transactions related to Mr. White that appeared to involve fraudulent activity with regard to the Whites' personal bankruptcy petition. The agent discovered what appeared to be assets not disclosed on the Whites' personal bankruptcy petition. They included an investment in stock, a security interest in Twin Flags Trucking protecting a $10,000 loan, a mortgage on Mr. White's real estate held by Ray Hart, and two large individual life insurance policies owned by Mr. and Mrs. White.

Meanwhile, the Whites' attorney, Mark Center, was convicted of bankruptcy fraud in an unrelated case involving a real estate development scheme called "Foxcliff." On April 1, 1987, while awaiting sentencing, Mr. Center's attorney, Forrest Bowman, was contacted by then-United States Attorney John Tinder who asked whether Mr. Center would like to tell the government anything about the Foxcliff case. The U.S. Attorney also broached the subject of the White Petroleum bankruptcy, telling Mr. Bowman that the government additionally would like some information from Mr. Center regarding that case. The district court found, however, that the government did not make any promise that could be interpreted as an exchange with respect to Mr. Center's sentencing for the information he was providing.

Mr. Center agreed to cooperate and his attorney, Mr. Bowman, met with the U.S. Attorney, two FBI agents, and a number of Assistant United States Attorneys to respond to questions previously posed by the U.S. Attorney regarding various matters, including the White Petroleum bankruptcy. Mr. Center also agreed to share nonprivileged information concerning Mr. and Mrs. White. The applicability of the attorney-client privilege was discussed at the meeting and the government noted it had no waiver of the privilege from Mr. White. Mr. Bowman gave general information regarding Mr. Center's firm's handling of the White Petroleum bankruptcy case, the decision for the corporation to file under Chapter 11, and who worked on the case at the firm. Mr. Bowman discussed some of the individual bankruptcies of Mr. White and his brothers and identified some of the

creditors of White Petroleum. He also discussed Twin Flags Trucking, and indicated that a conversation had taken place between Mr. Center and Nancy Dison, a paralegal at the firm. Later the government learned that during this discussion, Ms. Dison revealed to Mr. Center that she had prepared a mortgage release at Mr. White's request and improperly notarized it. She also told Mr. Center that she had been romantically involved with Mr. White for several years.

On April 30, 1987, Mr. Center was sentenced to one year imprisonment, with all but four months suspended. An appeal followed.

In investigating the White brothers, the FBI drafted a list of questions to be posed to Mr. Center to determine whether he was victimized, was complicit in the fraud, or was "a poor lawyer." The district court found that by this time the investigation of Richard and Judith White was essentially completed and the government had conducted all interviews and collected all the documents necessary for submitting the case to the grand jury, namely the life insurance records, the $10,000 loan records, the bank stock records, and the Hart mortgage information.

On August 26, 1987, two FBI agents met with Mr. Center and his attorney. Mr. Center described how he handled bankruptcy matters in general, and standard procedures at his former firm for processing bankruptcies. Later, Mr. Center stated that Ms. Dison probably collected the information contained in the bankruptcy schedules and that he probably reviewed the schedules after completion.

The district court found that by September, 1987 the only issues in need of resolution were whether the Whites had in fact provided information about the undisclosed assets to Mr. Center in his capacity as their attorney (in which case he might be complicit in the fraud), or whether there had been some legal decision to omit the assets from the bankruptcy schedules.

On September 8, 1987, Mr. Bowman met with Assistant United States Attorney Jackie Bennett and the FBI agents and told them that he wanted to see copies of the schedules Mr. Center had prepared and filed with the bankruptcy court. Mr. Bowman also indicated that prior to testifying before the grand jury Mr. Center wanted to review the files at his former law firm—particularly the drafts of bankruptcy schedules, the Ray Hart mortgage release, and notes and other information gathered by him to prepare the various petitions filed by the Whites.

During Mr. Center's visit to the law firm's offices, he discussed the attorney-client privilege with one of the firm's partners and assured the partner that the privilege attached to information that was confidential and that he would continue to recognize it. He also explained that he had consulted with Mr. Bowman regarding the privilege. While there Mr. Center openly reviewed the relevant files in the firm's library and members of the firm wandered through the library and engaged in conversation with him. Mr. Center had the files copied by a firm employee and chatted with firm members while he waited. After Mr. Center and Mr. Bowman determined that the photocopied documents did not contain privileged information, they gave the copies of the documents to AUSA Bennett.[1] Mr. Bennett was surprised that Mr. Center had copied the documents because he thought Mr. Center intended simply to review the files to refresh his recollection.

On September 24 and October 22, 1987, Mr. Center appeared before the grand jury and authenticated the documents he had copied and produced. He also testified about his former firm's procedures for handling bankruptcies in general and about the Whites' personal bankruptcy. Ms. Dison also testified before the grand jury. An

---

1. Mr. Bowman's independent assessment of the documents with regard to Mr. White's attorney-client privilege was that the documents contained information that was or would have been included in the bankruptcy schedule or was not confidential or even a communication from a client; thus, they were not privileged.

indictment was returned on December 16, 1987 against Mr. and Mrs. White.

We turn now to the matters raised by Mr. White on remand, that his attorney-client privilege was violated, that the government was complicit in this violation, and that the government engaged in outrageous misconduct.

 These are serious issues, and care and caution are always called for in inquiries or disclosures of this sort. This court has adopted the general principles of the attorney-client privilege as outlined by Wigmore:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) (citing 8 Wigmore § 2292). The burden falls on the party seeking to invoke the privilege to establish all the essential elements. *Id.* The claim of privilege cannot be a blanket claim; it "must be made and sustained on a question-by-question or document-by-document basis." *Id.* Finally, the scope of the privilege is narrow, because it is in "derogation of the search for truth." *In re Walsh,* 623 F.2d 489, 493 (7th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980). Any findings of fact will not be overturned unless clearly erroneous. *United States v. Nelson,* 851 F.2d 976, 978 (7th Cir.1988).

In *Lawless,* we held that "[w]hen information is transmitted to an attorney with the intent that the information will be transmitted to a third party ... such information is not confidential." *Lawless,* 709 F.2d at 487. There, the defendant had provided information to be used in the preparation of an estate tax return. Apparently, some of the information transmit-

ted to the attorney for this purpose never made it onto the return. We concluded, "[i]f the client transmitted the information so that it might be used on the tax return, such a transmission destroys any expectation of confidentiality which might have otherwise existed." *Id.; see also United States v. Windfelder,* 790 F.2d 576 (7th Cir.1986). We also noted that "disclosure of tax information effectively waives the privilege 'not only to the transmitted data but also as to the details underlying that information.'" *Lawless,* 709 F.2d at 488 (citation omitted).

Here, the district court found that the information in the documents obtained by Mr. Center from the firm was not privileged. The court also noted that Mr. White had not asserted that any particular information or document was privileged. The court suggested that some of the information would not even fall into the category of client communications.[2]

 When information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules, there is no intent for the information to be held in confidence because the information is to be disclosed on documents publicly filed with the bankruptcy court. *In re Feldberg* is not to the contrary. While there we noted the difference between expectations about communications and expectations about documents, we still emphasized that "[i]nformation imparted to counsel without any expectation of confidentiality is not privileged." *In re Feldberg,* 862 F.2d 622, 628 (7th Cir.1988).

 Here, there is no specification as to what information Mr. White gave Mr. Center for which Mr. White had an expectation of confidentiality. Evidence given to the grand jury was disclosed to Mr. White and yet he is unable to point to any specific information in the documents or Mr. Center's testimony to which the attorney-client privilege would attach. Mr. White simply alleges that the privilege applies to drafts

---

2. Mr. Center told AUSA Bennett that no one disclosed any information that was not contained in the bankruptcy schedule (i.e., information about the assets not included in the Whites'

personal bankruptcy petition). The district court found that this information was not a client communications, but "lack of communication."

of the bankruptcy petition and to interview notes used to prepare these drafts. The district court found that Mr. White made an insufficient blanket assertion of the privilege. He continues to do so in this court. We find no error in the district court's determination that Mr. White did not carry his burden of proving that any specified information in the documents was privileged.

■ Mr. White also pursues the claim that the government was an accomplice in a violation of his attorney-client privilege. Although we find no error in the district court's determination that Mr. White did not sustain his burden of proving that the documents were privileged, even if we did, we would agree with the district court that the government was not complicit in any violation. There is no evidence of any discussion or agreement between the government and Mr. Center to photocopy documents upon Mr. Center's visit to the law firm.[3] In fact, the evidence is to the contrary, including Mr. Bowman's statement that Mr. Center was going to *review* the files and AUSA Bennett's surprise when he was given the documents. The government did not induce Mr. Center to violate Mr. White's attorney-client privilege.

■ Also, Mr. White asserts that the documents were stolen from the law firm and therefore they could not be used by the government to obtain a conviction. Because we do not believe that the documents were stolen, we find no merit in this claim. The firm has not raised any allegations of theft. The evidence is that a partner of the firm knew that Mr. Center was at the firm to review documents, Mr. Center openly reviewed the files in the firm's library and did not remove the original documents from the premises, and a firm employee photocopied the files during office hours while Mr. Center chatted with firm members. Therefore, we agree with the district court's finding that Mr. Center had implicit permission from the firm to copy documents.

Finally, Mr. White alleges that outrageous conduct by the government justifies reversal of his conviction. We have previously noted that there is doubt as to the validity of the outrageous governmental conduct doctrine. *United States v. D'Antoni*, 874 F.2d 1214, 1219 (7th Cir. 1989); *United States v. Bontkowski*, 865 F.2d 129, 131 (7th Cir.1989); *but see United States v. Miller*, 891 F.2d 1265, 1267 n. 2 (7th Cir.1989). In any event we have never reversed a conviction on this ground. *United States v. Duncan*, 896 F.2d 271, 275 (7th Cir.1990); *United States v. Sababu*, 891 F.2d 1308, 1326 (7th Cir.1989).

■ In the initial opinion in this case, we suggested that:

> [i]f, however, the government, having the kind of hold over an attorney that it had over Center—for when it approached him he had been convicted but not yet sentenced—extracts from him client secrets that it then uses in a criminal trial of the client to the latter's substantial prejudice, this *might* be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment.

879 F.2d at 1513. Of course, based on our earlier conclusions in this case, there were no actions which could be claimed to constitute outrageous conduct. The government solicited Mr. Center's cooperation to confirm the information it had already obtained through its investigation of the Whites. As the district court found, when the government initially contacted Mr. Center it had completed the bulk of its investigation and was aware of the existence of the undisclosed assets on which the Whites' criminal charges were premised.

Mr. White has not alleged that any of the information was used at trial, and in fact the district court found that it was not. In addition, the district court found that the information was not client secrets, and that Mr. White has not shown any substantial

**3.** We note that *Mr. Bowman* asked Mr. Center to obtain a copy of the Ray Hart mortgage release that was notarized in blank.

prejudice he has suffered by the disclosure of the information. We find no error in the district court's conclusion that there was no infringement of Mr. White's constitutional rights under these facts.

For the foregoing reasons, the conviction of Richard White is AFFIRMED.